UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT DOYLE, Individually and on Behalf of a Class of All Others Similarly Situated,<br><br>Plaintiff,<br><br>-against-<br><br>COUNTY OF SUFFOLK, FORMER POLICE CHIEF JAMES BURKE, FORMER DISTRICT ATTORNEY THOMAS SPOTA, FORMER CHIEF OF THE GOVERNMENT CORRUPTION BUREAU CHRISTOPHER MCPARTLAND, and THOMAS IACOPELLI,<br><br>Defendants. | **COMPLAINT**<br><br>Index: |

## INTRODUCTION

1. This case arises out of a months-long illegal wiretap campaign that was concocted, executed, and used by the defendant law enforcement officials to solidify power atop the Suffolk County government rather than to do justice as servants of the public. In December 2021, this wiretap campaign became the focus of CPL 440 proceedings in the Supreme Court of the State of New York, County of Suffolk, during which time the District Attorney's Office and court recognized the illegal nature and aims of the campaign. Those 440 proceedings, brought on behalf of a wrongfully convicted former detective, ultimately resulted in the vacatur of an illegal prosecution and conviction—and the resulting recognition that all telephone calls that had been illegally recorded were separate acts in violation of the federal Wiretap Act and subject to its remedies. This action is brought to enforce those remedies on behalf of the named plaintiff as well as the putative class of similarly situated victims whose calls were illegally recorded.

1

## JURISDICTION, VENUE, AND JURY DEMAND

2. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as claims in this action arise under federal law—namely, 18 U.S.C. §2520

3. Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b), because that is the judicial district in which the claims arose.

4. The Named Plaintiff hereby demands a trial by jury.

## PARTIES

5. Robert Doyle ("Detective Doyle" or the "Named Plaintiff") has at all relevant times been a resident of the State of New York, which is where the misconduct against him was committed.

6. Defendant County of Suffolk is a municipal entity in the State of New York, home to the Suffolk County Police Department and the Suffolk County District Attorney's Office, and was the employer of all other individually named defendants in this case, all of whom were acting in the scope of their employment, under color of law, at all relevant times.

7. Defendant Former Police Chief James Burke ("Burke" or "Chief Burke") was until his arrest, prosecution and conviction the Chief of Police for the Suffolk County Police Department, acting at all relevant times under color of state law, as a policymaker, and in the scope of his employment.

8. Defendant Former District Attorney Thomas Spota ("Spota" or "District Attorney Spota") was until his arrest, prosecution and conviction the District Attorney for the County of Suffolk, acting at all relevant times under color of state law, as a policymaker, and in the scope of his employment.

9. Defendant Former Chief of the Government Corruption Bureau Christopher McPartland ("McPartland" or "Corruption Bureau Chief McPartland") was until his arrest, prosecution and conviction the head of Suffolk County's Government Corruption Bureau, acting at all relevant times under color of state law, as a policymaker, and in the scope of his employment.

10. Defendant Thomas Iacopelli ("Iacopelli" or "Detective Investigator Iacopelli") was at all relevant times a detective and agent in the Suffolk County District Attorney's Office, acting under color of state law and in the scope of his employment.

11. The "Individual Defendants" shall hereafter refer to all defendants in this action other than the County of Suffolk.

## BACKGROUND

12. In January of 2012, Suffolk County crowned Burke the Chief of the Suffolk County Police Department.

13. With Spota and McPartland by his side, Burke viewed himself as untouchable and above the law—using Suffolk County detectives like his personal palace guards, knowing he could act without impediment from any of the other highest ranking officials in the Suffolk County law enforcement community or government.

14. So entrenched was his protection in the law enforcement community that he and his high-ranking allies donned the nickname, "the Administration"—a term more traditionally reserved for the mafia.

15. Like mafia organizations, the Administration maintained an enemy list.

16. The Administration vowed to retaliate against their enemies.

17. One of the Administration's principal enemies was Detective Doyle.

18. Detective Doyle devoted 38.5 years to law enforcement, and he retired from the Suffolk County Police Department with a rank of Detective Sergeant out of the Homicide Squad. During the course of his decorated career he was bestowed the prestigious District Attorney's Award—twice; and he received many other commendations along the way.

19. The Administration viewed Detective Doyle as unwilling to follow their illegal propensities and practices.

20. The Administration's aggressive, corrupt, and controlling practices culminated in Burke's brutal assault of a handcuffed suspect, Christopher Loeb, which was followed by a conspiracy that metastasized across the Defendants in order to cover up the beating and to prevent witnesses from cooperating with a resulting federal investigation (the "Conspiracy").

21. Leading up to the time of the Conspiracy, a Suffolk County resident ("Person 1"), a non-party here, became a decorated police officer within the Suffolk County Police Department.

22. Person 1's most significant and dangerous work concerned investigations into members of the MS-13 gang.

23. As Person 1 climbed the ladder in the law enforcement community, he agreed to join a prestigious Task Force that allowed him and certain fellow Suffolk County officers to work alongside agents of the FBI, a Task Force that helped take gang-members off the street and reduce crime in the County.

24. Nevertheless, in the co-conspirators' attempt to limit oversight of the federal government and plug potential holes in the cover-up, they had removed Person 1 from the Task Force.

25. In response, Person 1 was believed to have leaked information to Newsday delineating the resulting spike in crime.

26. The co-conspirators used this as an opportunity to create a cover story. They agreed to feed false information to a local magistrate in order to secure a warrant to wiretap Person 1's phone—claiming, falsely, that Person 1's conduct had threatened "officer safety."

27. In reality, the wiretap campaign had nothing to do with officer safety, which was simply a cover story to deceive the court into issuing a wiretap warrant.

28. The co-conspirators had one goal among others: they wanted to discover if Person 1 or any of his friends, including Detective Doyle, were leaking information to the press and to dig up information they could then use to discredit and/or blackmail them into silence.

29. To that end, they remained on Person 1's phone for months and, on information and belief, listened to (and recorded) many hundreds, if not thousands, of communications between Person 1 and others, including the Named Plaintiff.

30. All Individual Defendants were involved in the illegal interception of the communications or the illegal disclosure and/or use of them, including but not limited to the following:

   a. James Burke was one of the ringleaders of the scheme, having committed the Loeb beating and, with Spota and McPartland, having led a cover-up of such conduct. He used the illegally wiretapped information in order to attempt to gain informational leverage against the Plaintiff, Person 1, and all other persons on the wiretap campaign whom he viewed as a threat to his corrupt regime or a potential leak of information about the beating.

   b. Spota was one of the ringleaders of the scheme as well, having been Burke's mentor and, with Burke and McPartland, having led a cover-up of Burke's beating of Loeb, which included using the wiretapped information to further that goal. On

5

       information and belief, Spota also signed several of the applications for the illegal wiretap scheme.

    c. McPartland was a high-level member of the scheme, working at the immediate direction of Burke and Spota, who expressly made a point to use the wiretap bounties as a threat to enforce loyalty among others under his supervision—as, in his words, if one wanted to know the consequences of blowing the whistle they could "just ask [Person 1]."

    d. On information and belief, Thomas Iacopelli personally prepared and signed the affidavits in support of the wiretap applications and then agreed to, and did, eavesdrop on Person 1's phone for three months while making constant reports to other coconspirators about the content of what he was listening to—a process during which he violated a variety of laws, including the obligation to minimize the scope of the eavesdropping, as well as the federal laws arising under the Wiretap Act.

31. At the conclusion of this campaign, the Individual Defendants and others pressured Person 1 into accepting a guilty plea to Penal Law §195.00 ("Official Misconduct").

32. Another benefit the co-conspirators secured from Person 1's guilty plea was that they avoided the discovery process and, thus, buried the perjurious wiretap application that led to the criminal charges.

33. Subsequently, the United States Attorney's Office indicted Burke, Spota, and McPartland for perpetrating the conspiracy to obstruct justice.

34. In 2021, the Conviction Integrity Bureau of the Suffolk County District Attorney's Office agreed to review Person 1's conviction.

35. Upon a comprehensive review of the facts and circumstances, in December 2021 they took the rare step of consenting to the conviction's vacatur on the express basis that it had been secured through a retaliatory campaign to abuse criminal process and violate the Constitution.

36. The "vindictive" prosecution of Person 1 was secured through "outrageous government conduct" that "reflect[ed] the co-conspirators' abuse of criminal process," the District Attorney's Office explained.

37. The Bureau "could not identify a valid legal basis for the wiretap … reflecting the co-conspirators' abuse of the criminal process…."

38. Person 1's conviction was vacated on December 2, 2021.

39. In vacating Person 1's conviction and dismissing the charges, the criminal court judge, Justice Fernando Camacho, acknowledged that although he had heard details about the federal trial, he, like the Named Plaintiff, could not fully grasp the extent of the defendants' misconduct until the motion practice he decided in December 2021. Justice Camacho then made a statement on record about the defendants and their conduct: "All of those who engaged in this vindictive conspiracy became the abusers and oppressors. … Shame on them."

## CLASS ACTION ALLEGATIONS

40. The Class in this action consists of people, other than Person 1, who were listened to, recorded, or whose communications with Person 1 were otherwise intercepted or reviewed without their consent, during the illegal wiretap of Person 1's telephones (the "Recorded Parties"), and could not reasonably learn that they were recorded in violation of the Wiretap Act until Person 1's conviction was vacated.

41. There was no probable cause to wiretap or listen to the private communications of the Recorded Parties.

42. Because the duration of the wiretap campaign spanned more than three months, the amount of Recorded Parties is on information and belief greater than forty persons.

43. Some of the Recorded Parties, including the Named Plaintiff, were recorded and/or intercepted on more than one hundred different occasions.

44. A Class of the Recorded Parties is so numerous that joinder of all members is impracticable.

45. A common question of law predominates over all members of the proposed class of Recorded Parties: namely, whether the conduct of the defendants represented a violation of 18 U.S.C. §2520 or otherwise violated their rights under the Fourth Amendment.

46. A common fact pattern predominates over all members of the proposed class of Recorded Parties: namely, all members were overheard on the same illegal wiretap campaign of Person 1

47. Detective Doyle's claims are typical of the claims of the other members of the proposed class of Recorded Parties: namely, he and all other members of the Recorded Parties were subjected to a wrongful interception of their private communications in violation of the Wiretap Act.

48. Detective Doyle will fairly and adequately protect the interests of the proposed class of Recorded Parties: he has hired competent counsel at Barket Epstein Kearon Aldea & LoTurco, LLP ("BEKAL") to represent his interests and those of the proposed class, a firm with extensive experience litigation civil rights as well as criminal cases; and one that, in fact, represented both Person 1 and Christopher Loeb in separate actions or claims against Suffolk County arising out of this broad universe of facts.

49. A class action is a superior vehicle to other available methods for the fair and efficient adjudication of the Recorded Parties' claims.

50. By combining resources and presenting the action as a class, the Named Plaintiff as well as all proposed class members demonstrate the widespread problem presented by the Defendants' conduct and the public interest that this action seeks to vindicate.

51. This case seeks to vindicate the public interest in recognizing that when an illegal wiretap takes place it victimizes not only the target of an illegal investigation but also additionally innocent third-parties who have their private communications recorded by government agents—a public interest and a recognition that the Wiretap Act is specifically designed to counteract.

52. Defendants are liable to the Class in an amount to be determined by a jury, but in excess of all jurisdictional limits on lower courts.

## **CAUSE OF ACTION**

### **VIOLATION OF THE WIRETAP ACT, 18 U.S.C. §2510** *et seq.*

53. The Named Plaintifff repeats and realleges all prior allegations as if set forth again herein.

54. The Plaintiff's oral, wire and electronic communications were intentionally and illegally recorded and intercepted by the Individual Defendants in violation of 18 U.S.C. §2510 et seq., as were those of all members of the putative class.

55. The illegal recording and interception of these communications was done for the malicious purpose of furthering the Defendants' scheme to violate the due process rights of Person 1, to make an example of him, and to solidify the corrupt governance of the law enforcement leadership.

56. The Defendant County of Suffolk is liable for the wrongful conduct of the Individual Defendants by virtue of *respondeat superior*.

57. As a direct and proximate cause of the illegal wiretap scheme, the Plaintiff, and members of the putative class, sustained damages and are entitled to both compensatory and punitive damages arising under 18 U.S.C. §2520.

**WHEREFORE**, Plaintiff prays for relief as follows:

A. That the Court award compensatory damages to Plaintiff and putative class members, and against the defendants jointly and severally, in an amount to be determined at trial;

B. That the Court award punitive damages to Plaintiff and putative class members, and against all defendants, in an amount to be determined at trial that will deter such conduct by defendants in the future;

C. That the Court certify the putative class;

D. For a trial by jury;

E. For a pre-judgment and post-judgment interest and recovery of their costs; and

F. For any and all other relief to which they may be entitled.

Dated: Garden City, New York
       November 30, 2023

**BARKET EPSTEIN KEARON
ALDEA & LOTURCO, LLP**

By:    /s/
Bruce Barket, Esq.
Alexander Klein, Esq.
666 Old Country Road, Suite 700
Garden City, New York 11530